on behalf of Dwight Alexander. Let me begin this way. It just can't be that an AUSA can pull a defendant into court, speak to him, have him testify in a different proceeding with zero indication whether that defendant has spoken to his attorney, particularly when that defendant has not signed off yet on the plea agreement. If he would have signed off on the plea agreement, I don't think we'd be here because I would have a difficult time trying to argue to your honors that Mr. Alexander could not reasonably believe he had immunity. Give me a 1, 2, 3 timeline. He had a lawyer at one point, then it wasn't a lawyer, then another lawyer. So just give me a 1, 3. So he had a lawyer at the inception of this, right? Your Honor, timeline-wise, it would be difficult for me to tell you how many lawyers. He had 11 lawyers. I'm number 11. Okay. I didn't mean it. He had one and he didn't have one. He testified at court in the Pendleton case that he had not accepted the plea agreement yet because he was waiting to get with the lawyer to clarify some issues. There's always the public defender which he started with. It just boggles my mind that, again, that the government can have the marshals bring someone to court, an attorney for the government goes meet with him when they well know he's already represented or had been represented, or he's in the middle of being prosecuted, and just say, we need you to testify in the Pendleton case. I'm going to call you in a few minutes to testify. But he had a lawyer at that point, right? I believe he did, yes. He went in pro se, all right. I don't know why he would not have had a lawyer at that point. Okay. It was reasonable for Mr. Alexander to detrimentally rely on Mr. McSherry's representations or pulling him to court to testify against Cornell Pendleton. The government got what it wanted. Mr. Alexander, as I put in my brief, spilled his guts. But it's undisputed there was a plea agreement of sorts, right? They had offered him a plea agreement. He had not signed off on it yet. That is correct. Did he have a lawyer participating in that discussion of the plea agreement? Yes, Your Honor. He also had a lawyer admittedly to represent him and was physically present at every proffer when they met with the government to talk about his case and the Pendleton case. Does the record show or is there an indication that when the plea agreement was negotiated, there was discussion about testimony in the Pendleton trial or another trial as part and parcel of that negotiated plea agreement? I believe that is correct. All right. So the lawyer who he had at that point was privy to discussions about potential testimony, correct? Yes, Your Honor, but it doesn't forgive the fact that the government had, for lack of a better term, an ex parte conversation with Mr. Alexander. Did he try to say at the time, I'm not testifying until I have a deal? There's no evidence of that because . . . What is your evidence that there was immunity offered? I'm arguing it's implied immunity, Your Honor. So no . . . There's no . . . Implied immunity. Tell me what the evidence is that supports the idea that there was implied immunity. The actions of the government or equitable . . . or when it could have been applied. There's no evidence that it was specifically offered. That's the whole gist of my argument for equitable immunity. But this court said in the Weiss case, which is cited in the brief from 1979, there are three circumstances under which this court would consider equitable immunity and two of them, I believe, apply in this case. The defendant's cooperation is a one . . . there are three. That's one. I'm going with number two and three. And number three, the government's conduct might be, and I'm not saying it is, but it might be so egregious as to constitute a violation of due process. And it's certainly a violation of due process if the person or entity that is trying to incarcerate you comes to speak to you during the prosecution without your attorney being present. There's no evidence . . . Here's the thing, the bottom line. If the trial judge would have conducted an evidentiary hearing on the motion in limine to exclude the Pendleton testimony, we may not be here. That's the nut of the case. If the court . . . because at that point, everything would have been on the record. But everything was on the record. I mean, the reality is everything in the record indicates that what he was doing was testifying to further the plea agreement that they were talking about, which he then eventually rejected. In other words, he says things in the Pendleton trial that are along the lines of, yeah, I know I've got to tell the truth because if I lie, my plea agreement may be off the table. He didn't say anything that suggests, even remotely suggests, that he had immunity. Did he? Again, the word immunity is . . . What was his report supposed to find out in an evidentiary hearing when the court already had a transcript laid before it? The word immunity doesn't pop up until his motion in limine to exclude the Pendleton testimony. I would confess for argument purposes only that he did not mention immunity during Pendleton, and it was not mentioned at all, and it's not in the record until . . . But it's not that he didn't mention the magic word immunity or equitable immunity or implied immunity. It's that everything he said related back to the plea negotiations, and that was for a lesser sentence. That wasn't for, you're not prosecuting me at all. That's fine, Your Honor, but what bothers me . . . But there's a difference between a plea agreement that gives leniency in sentencing and immunity from prosecution. But I'm not arguing to set aside a plea agreement. I'm arguing that . . . There isn't one to set aside, right? That's correct, but what I'm arguing is the moment Mr. McSherry talked to Mr. Alexander, he should have had his lawyer, and then his lawyer could have said, look, as part of the deal, you have to get up on the stand and tell the truth. Then if he'd have spilled his guts, he'd have spilled his guts. But in any part of the plea discussions, like I asked you before, did Mr. Alexander say, you know, I want my lawyer? Or when he got called to testify, did he say, I'm not getting up there until my lawyer is present? Did he say anything in the record that he ever asked for? No, he did not, but I don't think you have to do that, Your Honor. I mean . . . You have a right to your attorney. We're in the middle of prosecution. He didn't invoke the right. I don't think he had to. That's what Judge Stewart's asking you is, did he ever invoke the right? No. I can't say that the record reflects that, but I don't believe he has to. Well, I mean, now we're trying to make him the victim, but you just said the guy had eleven lawyers. I mean, he's a little savvy, to put it mildly. There's a point at which he fires lawyers, et cetera, so it's hard to discern. The district judge knew more than what we know. My question to you is, we understand your argument, but at bottom with the standard of review, where's the abuse of discretion by Judge Zaney in not holding a hearing when he had all these facts, knew everything that's being heard and so forth? I might have done something different, but where's the abuse of discretion in not holding a hearing when he has all the facts in front of him? Because I think it forced or it allowed the judge to make credibility decisions. No. What's your best case for that? Excuse me? What's your best case for that? I can't really put one in front of you. It goes back to, I understand, abuse of discretion. I fully understand. I've argued too many of these. I know you have. I don't know who I'm saying. I hear you. I understand what your argument is, but point me to a case where we said, you know, we get lots of these where judges hold a hearing, don't hold it, et cetera, et cetera, but standard of review is what it is. With all that was laid out, if the district judge determined clear agreements there, et cetera, et cetera, what was the missing element that he would have needed to . . . It was an abuse of discretion not to conduct the hearing. I think Mr. Alexander's lawyer at a hearing would have had the opportunity to cross-examine Mr. McSherry who just submitted an affidavit. I think the court relied on just too many documents not to have a hearing. You may . . . Again, as I told you, if there was an evidentiary hearing, I might have had an Anders brief. Well, it's true. We don't have a claim in front of us of ineffective assistance of counsel. None of that's here. This is not usually the right proceeding to bring. No, no. I know. I'm just saying, we're just asking. Sure. Us, this stems from negotiations of a plea agreement. He ultimately got, what, 136 months concurrent with 120. They had a plea agreement for, as Justice Wilson said, more favorable sentencing. That's why I asked, within those discussions, was immunity ever an integral part? As we understand it, the answer to that is no. Here's what I'm asking. I'm asking this court to revisit ultimately the Weiss case and decide to apply equitable immunity. This court has said, 1979, I don't remember how many years ago that was, the year I graduated. Let me ask you this. Are you asking us to fit this case within some existing precedent, or are you asking us to make new precedent on equitable immunity? Well, I'm asking you to do what you said in Weiss, that there are circumstances under which you would apply equitable immunity. So you're really not creating new law. You're just using what you sat there, or said there, and now here's the perfect set of facts in which to implement it. Various courts, as cited in my brief, like the Seventh Circuit said, even as late as 1999, U.S.V. given, G-I-V-E-N, equitable immunity can be implied by the conduct of the parties. I think when the government's attorney interviews you while you're in your cell or in a cell . . . What's the ultimate relief you want? For us to vacate and order the district court to have . . . What's the relief you're . . . Obviously, I'd like to vacate and leave it at that, but I think the right legal solution is to vacate and order an evidentiary hearing to determine whether or not the motion in Lemony should have been granted or not. I mean, that's the least . . . That's the easiest and least to the case. At that point, the trial judge would decide, and then, because you can't just say, oh, we can review the record and forget about the Pendleton transcript and see if the jury would have made a finding of guilty or not. There's no way, because the government called the agent first involved and put in the Pendleton transcript the first thing, and in my opinion, the case was over at that point. There was no need to go any further with anything else. As I said in my brief, I admit it. He spilled his guts in the Pendleton trial. It was critical that that transcript not be included in his trial, and I reserve the balance of my time. Thank you. Thank you, sir. We appreciate it. All right. We'll hear from the government. Mr. Boynton, you've been around the block a few times. Now and then, it's always good to be back, though, Your Honor. Right. Thank you, Your Honors. May it please the Court, Kevin Boynton for the government, along with Diane Copes and Ryan McLaren. Judge Stewart, just to go ahead and answer a question you had first about a potential timeline, just so we're all on the same page. An original plea offer was made from the government to Mr. Alexander's counsel in November and December of 2016, and that offer would have required cooperation with the government in the Pendleton matter. There were also, as the record demonstrates, and that plea offer, by the way, is in the record at pages 249 to 250, also 6581 to 85, and 6630 to 32 were the copies of the draft plea agreements as well. There were also documented proffer sessions with Mr. Alexander and his attorneys with the government and the DEA in preparation for the Pendleton trial, and those documents are in the record. First of all, those proffers happened in March and April of 2017 and also November of 2016, and copies of those will be in the record at 246 to 248 and 251 to 254, and as the affidavits of AUSA McSherry and the case agent Kevin Tragel, which are from 325 to 327, those affidavits talk of prior proffer sessions with both sets of attorneys, with Mr. Alexander's attorneys and the government's attorneys and Mr. Alexander present, talking about his own involvement and in anticipation of testimony for the upcoming Pendleton trial, and the Pendleton trial, the Cornell Pendleton trial that Mr. Alexander testified in was in April of 2017. So the question comes up, and Judge Wilson, I think this goes a little to the question you were asking about what does the record show. Well, the record shows that at that point everyone was on board that there was going to be cooperation from Mr. Alexander, that he was going to cooperate with the government and testify against Cornell Pendleton. That's kind of important because when opposing counsel talks about Mr. Alexander's right to counsel, of course he has right to counsel. He did not invoke it. There's nothing to say that he did at that time, at least in the record, other than a bare allegation, but if we look at how things are going from the plea offer to the proffer sessions up to the trial, everybody is operating under the assumption that Mr. Alexander is on board, and it seems Mr. Alexander is operating on that board too. So when AUSA McSherry goes to the marshal's holding cell and tells him you're about to come up to trial and emphasizes the importance of telling truthfully, there's no surprise there. There's no reason to think at that point that Mr. Alexander has a problem and says, wait, I need my attorney. But up to now, the narrative you've given, he's had a lawyer that was involved in the plea discussions over 2016, the proffer, et cetera. So when he comes up to, well, first of all, where's the timeline when the plea agreement broke down? I mean, wasn't it signed? I mean, you're talking about late 2016 over to the spring of 2017 against the trial in Pendleton occurs in what, 2017? In April of 2017. So in that span, there was a plea agreement, I guess a draft or whatever included. So where was there not a meeting of the minds? Was the lawyer engaged? I'm not sure exactly why it broke down. I guess I should ask it another way. Was it contemplated by him that something else was to occur before the plea agreement? Was it contemplated by Mr. Alexander that there would have been something? Well, either the government or something else, that something else, you know, you've got this draft, but there's something else that's going to transpire that's an ingredient of the, you know, of the plea agreement. Or was it that, well, the plea agreement was going to be confected after he testified or whatever? Because you said, which I was a little surprised that back in 2016, the notion of his testifying in the Pendleton trial was discussed then, right? That's correct. And the only thing I can tell you from the record, Your Honor, obviously I'm not, I don't know what conversations Mr. Alexander and his lawyer would have had, but the only thing I can see in the record is there was a change in lawyers. When the offer was first made in November 2016, he had one lawyer when the proffers were going on in March and April and ultimately the trial of Pendleton, he did have another lawyer. Now, Mr. Alexander testified on the stand and was asked that question about you have not, saying you did not sign a plea agreement yet. And Mr. Alexander stated he had changed attorneys and that the plea agreement was being finalized. And his testimony is at 2589 to 90 and 2634 to 35. That's the contemporaneous testimony that he would have given at the Pendleton trial. He said it was being finalized, but he also knew that if he lied, any plea agreement would be pulled off the table, that he could also serve extra time for perjury, and that he was testifying and hoping to lower his sentence. I thought I read that he would say McSherry either said or otherwise that he didn't talk to Alexander before he put him on the stand. Is that right? Right, and Mr. McSherry's affidavit states that, and he does say that he had met with him in a previous trial preparation session once. With a lawyer or without a lawyer? Mr. McSherry's affidavit doesn't make clear that it was with the lawyer, but if you look at Agent Tragel's affidavit and the DEA March 2017 report, it indicates that Mr. Alexander's attorney was there at that time. Okay, so how does it get to McSherry puts him on the stand and the lawyer's MIA when all these discussions have occurred with a lawyer present? And Mr. McSherry says he didn't talk to him before he put him on the stand. Now, way back in ancient days, I was in the USA, and I never put a witness on the stand, not having prepped him, briefed him, knowing what he or she was going to say, et cetera. So we might understand that he just put him up there, presuming he's going to spill his guts, but not knowing, and not, well, where's your lawyer when the lawyer's been engaged this whole time? Sure. Not exactly, Judge Stewart. Mr. McSherry was not directly on the trial team. That was two other AUSAs, Mr. McSherry. I'm not casting aspersions. I'm just trying to connect in my mind this lawyer for Mr. Alexander has been engaged all the way up to this point, and then we get to the point where he's going to be put on the stand and his lawyer is MIA for whatever reasons. No prep of what Alexander's going to say, and he's just kind of put up there. So it just worries me some where the lawyer drops out of the picture. I understand, and that may be more of another claim, but I understand the concern. But again, I think if you look at it as well, Judge Stewart, this wasn't a situation of Mr. McSherry putting Alexander on the stand and questioning himself. This was literally going to the marshals and saying you're about to be going on. And again, if everybody's on the same page, if Mr. Alexander's lawyer and Mr. Alexander and the government attorneys are all on the same page that Mr. Alexander is testifying favorably for the government and cooperating, there's no reason, it doesn't appear from the record or anything from these documents a concern that I would say Mr. Alexander's attorney would have to be there because ultimately . . . I mean the prep work was basically done at that point, the witness prep and the interviews and all that sort of thing. Correct, as is documented in the affidavit. And of course in that situation, the attorney can certainly grab a transcript of his client's testimony to help prepare for any sentencing and help request any 5K motion from the government. And there's no reason to think Mr. Alexander is going to invoke counsel or say I have a problem. And as you pointed out, Judge Wilson, the record shows that he actually didn't do that. Supposedly right after this meeting with Mr. McSherry, instead of going on to the . . . when he gets called to the stand moments later, which is about 10 minutes after the meeting from what all parties seem to suggest, he doesn't say I don't want to be here. He doesn't say I don't want to testify. He doesn't say I need my lawyer. He doesn't say I just got promised immunity. What he says is we're finalizing a plea agreement. I changed lawyers, but we're finalizing. I'm hoping to get a leniency here. So everything we see from the testimony at that time is consistent with someone who has been cooperating with the government and hoping to get the benefits. And that leads to the next question of why . . . or the next point about why the district court here did not abuse its discretion in one, either denying the motion to eliminate to exclude Mr. Alexander's or denying the evidentiary hearing. If you look at what's on the ledger here on each side, the only thing that Mr. Alexander brought to the district court was the bare, unsworn, and unsupported allegation that Mr. McSherry had granted immunity. And that was not even raised until his opposing counsel mentioned, I think, until much later, maybe a year later when the motion to eliminate was filed, at least on the record. If it was made earlier than that, it's not . . . I may be missing it, but the motion to eliminate was filed a year later. But in contrast to that unsupported allegation, the government pointed to Mr. Alexander's contemporaneous testimony given ten minutes after this meeting, where he doesn't say anything about immunity but talks as one who has a deal. The government provided the DEA reports, the plea offer that was made, the affidavits of the agent, and the AUSA. And the only thing contrary to that were post hoc assertions by Mr. Alexander. There was no abuse in denying the motion or denying an evidentiary hearing based on this. The unsupported, unsworn, bare allegation was inconsistent with and contradicted by a sworn testimony at trial, which under Blackledge v. Allison carries a presumption of verity. And so the record document supports the district court's conclusions that the assertions in Alexander's accounts were plagued with contradiction, ambiguity, and omissions. And this is supported even more that when you look at Mr. Alexander's own testimony at his own trial later on, the claim is expanded. By that point, it's not just Mr. McSherry who gave him immunity, but on the record, he then all of a sudden . . . the entire trial team gave him immunity in a prior court session. So that's inconsistent and makes it incredible. And it didn't need an evidentiary hearing. As the court has pointed out, evidentiary hearings are not given as a matter of course. They're only held when the defendant alleges sufficient facts, which if proven, would justify relief. But they're not given for a party to seek out a case in search of its existence. That's what this would have been if the district court didn't abuse its discretion. But even if it had, and I'll move over to a little bit of the sufficiency question here, aside from Mr. Alexander's testimony that was used against him from the Pendleton trial, there was more than sufficient evidence. The testimony and the evidence showed that Alexander gave his cutting agent, Benita, directly and indirectly to drug dealers, knowing what they would do with it, particularly Michael Serena, who was a high-scale level heroin trafficker in the area. He advertised the Benita cutting agent as a way to stretch their drug product and therefore stretch profit. He researched and asked questions about how to make money with cutting, and he advertised it as a cutting agent for them. He made it in brown or white so it could be mixed in with the color of heroin and cocaine, and he placed it for sale in a food store directly across from a barber shop where a lot of drug dealers hung out. He knew the market for cocaine and heroin. He knew that drug dealers would be the natural target of his Benita. In the light most favorable to the verdict, this is sufficient evidence of his knowledge and participation in the drug conspiracy, and if there are no other questions, we would ask the Court to affirm. Okay. Thank you, Your Honors. All right, thank you. Back to you, Mr. Plaisance. First, thank you, Your Honors, and I appreciate the questions. Judge Stewart, you used the word that really concerns me. You said it worries you that there was no lawyer, and that is the crux of the case. I may be hanging my hat on one thing, but one thing is sufficient to reverse a case. It's the fact . . . Well, I was just trying, and I haven't read it, just trying to keep the chronology clear . . . No, I understand. . . . when there was a lawyer, when there wasn't a lawyer, et cetera, et cetera, but anyway, press ahead. The fact that his lawyer was not present is obviously a matter that concerned the government because Mr. McSherry in his affidavit even mentioned the fact that Mr. Alexander had not asked to see his lawyer, but that's not the point. You said yourself, Judge Stewart, that you were a prosecuting attorney. It would seem to me as you indicated, and it would seem if I was prosecuting and called anyone to testify in a different case, regardless of the number of proffers, discussions, meetings . . . Yeah, but as counsel opposite ably lays it out, so much had already been discussed here. My question was sort of in a vacuum, but as he ably laid out, I mean, this thing started here, stretched out. Clearly, he knew he was going to testify. He knew that testifying was part of the original proffer, et cetera, et cetera, et cetera. He never invoked, et cetera, so in a vacuum maybe, but given this long scenario, I'm not sure. That's why we had a case for the argument because we haven't dug into all the pages of the record and so forth of what's there. Are you continuing to challenge the sufficiency or is your main thrust on the hearing and the equitable . . . The equitable immunity. Equitable immunity, I'm sorry. Yes. I mean, he testified, as you said, spill his guts, et cetera, so it's not a serious challenge that there's not . . . Well, and that was my first assignment of error and interestingly, the government's pretty flip-flopped it and argued the sufficiency extensively and narrowly argued my first issue, which I found that strange. Strange from their perspective, but in doing many appellate cases, it's rare that I've seen a complete flip-flop of the arguments that way. It shows what we're both hanging our hat on, I believe. Okay. I'm not going to take up any more of the Court's time unless you have any questions, but I think I've well laid out the fact that this is one of those circumstances arise that it should apply equitable immunity. At a minimum, Judge Stewart, based on some of your questions, you could apply the plea. If you said everything was taken care of and it was just a matter of him signing off and if he testified at the Pendleton hearing, it was just a matter of finalizing it, then maybe we should go back and take the plea. But I know this Court's not going to do that and I know the government would be strongly opposed to that argument and I would fully understand that, but the bottom line is this. As a practicing attorney about to start his thirtieth year and I've begun numerous appeals, it just concerns me that despite everything else, the proffers, the paperwork, the discussions, that you can just bring in a defendant, put him in a cell. A defendant, if he was just a material witness, might be totally different because he's just a witness from down the street, but this guy has a pending indictment against him. Put him in a cell, talk to him for ten minutes. Without his attorney being present, put him on a stand and you're so hell-bent on convicting Pendleton, which Mr. Trago said in his testimony that that was always the goal to get Mr. Pendleton. He said that at record 1269. The government always sought Alexander's cooperation to get Pendleton. The government knew they needed Dwight Alexander. It just bothers me that due process and the protection of attorney-client does not require that his attorney be present during that discussion. If the attorney was there, then he took the stand and pulled his guts, it's a whole different ballgame. That's not what occurred in this case. I ask you to vacate and remain for an evidentiary hearing. Thank you. Thank you, counsel. Mr. Pleasant, you are a court-appointed attorney in this case. The case is novel, to put it mildly. The court's questions, as you know, are more proving. They are not dispositive in any way. Hopefully, none of our comments are taken that way, but it's very seriously we do. The panel and the court richly appreciates appointed counsel who come into a case, particularly a case like this that's novel and so forth, but nevertheless is the stellar advocate that we expect and appreciate. Please know that we appreciate your zealousness in this case and others that you take to represent as a court-appointed, taking the record as you find it and to ably present before the court. With that, we thank you. Thank you. All right. Thank you. Thank you, government.